# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

*JH*

DAVID L. CHRISTIE,  )
  )
  Plaintiff,  )
  )  **Case No. 04 C 3787**
v.  )
  )  **Magistrate Judge Jeffrey Cole**
JO ANNE B. BARNHART,  )
**Commissioner of Social Security,**  )
  )
  Defendant.  )
  )

## MEMORANDUM OPINION AND ORDER

This case involves a review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying Mr. Christie's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2). Mr. Christie seeks a reversal or remand of the Commissioner's decision, while the Commissioner seeks an order affirming the decision. For the following reasons, the plaintiff's motion insofar as it requests a remand is granted, and the Commissioner's motion is denied. [1]

### I.
### PROCEDURAL HISTORY

On May 3, 2000, Mr. Christie applied for DIB alleging that he became disabled as of May 10, 1999. (Administrative Record ("R.") at 132-34). His application for benefits was initially denied on August 30, 2000. (R. 40-43). Subsequently, on November 8, 2000, Mr. Christie's request for reconsideration was also denied. (R. 48-50). He then filed a timely request for a hearing and, on September 4, 2002, Mr. Christie appeared with counsel and testified at a hearing before an

---

[1] This case was assigned to me im May, 2005, when I was sworn in as a magistrate judge.

administrative law judge ("ALJ"). (R. 51, 111-16, 960). In addition, Dr. Mark Oberlander, a psychologist, testified as a medical expert, and Christopher J. Yep testified as a vocational expert. (R. 996-1000, 1000-05).

In a decision dated September 24, 2002, the ALJ found that Mr. Christie was not disabled because he retained the ability to perform a limited range of light work. (R. 21-29). This became the final decision of the Commissioner when the Appeals Council denied Mr. Christie's request for review of the decision on April 22, 2004. (R. 6-8). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Christie has appeal that decision under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE AT THE HEARING AND REFLECTED IN THE THOUSAND PAGE RECORD

Mr. Christie was born on January 25, 1951 and was forty-eight years old at the time of the onset of his alleged disability. (R. 132). He alleges that he became disabled on May 10, 1999, due to lower back, nerve, and knee problems, weakness in his right arm and hand, anxiety, stress, and depression. (R. 143).

Mr. Christie attended college, has an Associates degree, and spent some time in the military. (R. 149, 243, 254, 367, 971). He previously worked as a delivery driver for a film distributor, a slot changer for a river boat, a pizza delivery driver, an aide, and a limousine driver. (R. 144).

### A.
### The Medical Evidence

**1.     1977 - 1997**

From 1977 to 1997, Mr. Christie underwent marriage counseling and psychiatric treatment

2

due to a depressive disorder, a narcissistic personality disorder, a psychotic disorder, an adjustment disorder, and an alcohol abuse disorder. (R. 362-64, 366-69, 373-76).

## 2. 1999

On May 10, 1999, while driving his truck for work, Mr. Christie began to have trouble breathing, became light-headed and weak, and experienced chest pain. (R. 204, 358). He was admitted to the emergency room at Jackson County Public Hospital and hospitalized overnight. (R. 204, 358-61). While hospitalized, Mr. Christie had intermittent arm pain as well as discomfort and weakness in both his legs, and was diagnosed with atypical chest pain, but no cardiac pathology was noted. (R. 204, 358-61). Hospital records, at that time, indicated that Mr. Christie had a history of gout and chest pain; however, a prior cardiac catherization was negative for possible angina. (R. 359). The records further reflected that he previously had hernia surgery as well as several surgeries to correct bilateral knee and ankle problems. (R. 359). On May 11, 1999, when Mr. Christie was discharged from the hospital, he was instructed to follow-up for further treatment with a cardiologist. (R. 358). He was prescribed Prilosec[2] and aspirin. (R. 358).

Mr. Christie had a consultation with Dr. Wayne R. Gavino, M.D., a neurologist, on May 17, 1999. (R. 204-05). Dr. Gavino noted that Mr. Christie had recently been hospitalized for chest pain and complaints of pain shooting down his right arm and occasionally toward his left arm. (R. 204). He indicated that Mr. Christie had been in an automobile accident two years earlier and, as a result, had a history of right sciatic nerve impingement for which he was being treated by a chiropractor and orthopedic physician. (R. 204). Dr. Gavino further indicated that Mr. Christie recently had a stress

---

[2] Prilosec is used in the treatment of stomach and duodenal ulcers, erosive esophagitis, heartburn, and other symptoms of gastroesophageal reflux disease. *The PDR Family Guide to Prescription Drugs* (*"PDR Family Guide"*) 545 (9th ed. 2002).

3

echocardiogram, which was essentially negative and he had been referred to him for evaluation of neck pain. (R. 197-98, 204). He examined Mr. Christie and determined that a magnetic resonance imaging ("MRI") study of his cervical spine was necessary in order to rule out cervical radiculopathy. (R. 205). Dr. Gavino noted that Mr. Christie would need to be re-evaluated after having the MRI. (R. 205).

On May 20, 1999, Mr. Christie underwent an MRI of his cervical spine. (R. 200). The MRI showed a focal disc herniation in the right paracentral and lateral recess at C5-6 with a mass effect on both the thecal sac and nerve roots with possible osteophytes. (R. 200).

Dr. Gavino saw Mr. Christie on May 25, 1999 and noted that, with respect to his cervical spine, he had a disc herniation at C5-6. (R. 196). Dr. Gavino indicated that Mr. Christie had lower back pain that radiated to his right leg and that his straight leg raising was limited bilaterally to forty-five degrees. (R. 196). On that same day, Dr. Gavino wrote a letter stating that Mr. Christie had neck and lower back pain secondary to a pinched nerve and would need to have an MRI of his lower back. (R. 203). He indicated that Mr. Christie was unable to return to work and would be off from work an "indefinite" amount of time. (R. 203).

On May 28, 1999, Mr. Christie underwent an MRI of his lumbar spine. (R. 199). The MRI revealed a mild degree of diffuse bulging of the annulus at the L2-3, L3-4, and L4-5 levels, without any evidence of spinal stenosis or neuroforaminal compromise. (R. 199).

Mr. Christie was treated by Dr. Gavino for neck and lower back pain on June 3, 1999. (R. 195). At that time, Dr. Gavino found that Mr. Christie had severe cervical disc problems at C5-6; lumbar spondylosis; mild multilevel bulging; hypoactive, but symmetrical reflexes; and positive straight leg raising at thirty degrees. (R. 195).

4

Mr. Christie saw Dr. Gavino again on June 24, 1999 and July 12, 1999, due to back pain shooting down into his legs, which caused his legs to tingle and shake at times. (R. 193-94). Thereafter, on July 13, 1999, Mr. Christie underwent an electromyogram ("EMG") study of his lower extremities, which revealed no signs of lumbosacral radiculopathy or peripheral neuropathy. (R. 191-92).

On July 26, 1999, Mr. Christie sought treatment from Dr. Gavino due to continued lower back pain. (R. 190). As of that date, Mr. Christie reported that his right leg still gave out at times and his lower back pain was aggravated by driving or sitting for periods of time. (R. 190). Dr. Gavino noted that he was uncertain about the cause of Mr. Christie's lower back pain and referred him to a neurosurgeon for further evaluation. (R. 190).

Mr. Christie saw Dr. James B. Mansfield, M.D., a neurosurgeon, on August 3, 1999. (R. 377). Dr. Mansfield noted that Mr. Christie had intermittent right leg pain more than left leg pain and initially had some neck and right arm pain, which had largely disappeared. (R. 377). His neurological examination revealed hyperalgesia with decreased vibratory sensation of the right leg. (R. 377). Dr. Mansfield diagnosed him with lumbar myofascial syndrome and asymptomatic C5-6 disc herniation. (R. 377). He referred Mr. Christie to a pain clinic. (R. 377).

On August 19, 1999, Dr. Roger Tolentino, M.D., a pain management specialist, conducted a pain management evaluation of Mr. Christie. (R. 201-02). Dr. Tolentino noted that Mr. Christie had complained of severe, unrelenting lower back and right leg pain since May 1999. (R. 201). He indicated that Mr. Christie had been driving his truck for work in May 1999 when he had a sudden onset of chest pain, lower back and right leg pain, and arm pain. (R. 201). At that time, Mr. Christie also complained of neck and right arm pain that was worse than his left arm pain. (R. 201). Dr.

5

Tolentino noted that Mr. Christie was treated at the emergency room and had follow-up treatment with Dr. Gavino, Dr. Timothy Wang, M.D., a cardiologist, and Dr. Mansfield. (R. 201). He further indicated that Mr. Christie had been treated two days earlier at Sherman Hospital's emergency room for severe exacerbation of his pain. (R. 201).

Dr. Tolentino noted that Mr. Christie had tried physical therapy and had taken a course of muscle relaxants, nonsteroidal anti-inflammatory medications and opioid analgesics (synthetic narcotic with opiate-like activities), but had no significant relief. (R. 201). His current medications included Motrin[3], Vicodin[4], and Flexeril.[5] (R. 201). Dr. Tolentino indicated that Mr. Christie complained of a significant sleep impairment and his pain was aggravated by any physical activity. (R. 201). He further noted that Mr. Christie had right leg weakness, had not worked since the onset of his pain in May 1999, and had undergone multiple surgeries.[6] (R. 201).

Dr. Tolentino found Mr. Christie to be moderately obese, very anxious, and an uncomfortable-looking middle-age individual who was in moderate distress secondary to pain. (R. 201). He found Mr. Christie as being moderately clinically depressed because he had a Beck Depression Inventory ("BDI") score of 31. (R. 201). Upon examination, Dr. Tolentino noted that

---

[3]Motrin (or Ibuprofen) is a nonsteroidal anti-inflammatory medication prescribed to treat mild to moderate pain, rheumatoid arthritis, and osteoarthritis. *PDR Family Guide*, at 431.

[4]Vicodin is a narcotic medication prescribed to treat moderate to moderately severe pain. *PDR Family Guide*, at 732.

[5]Flexeril is a muscle relaxant prescribed to relieve muscle spasms which result from injuries such as sprains, strains, and pulls. *PDR Family Guide*, at 283.

[6]Plaintiff's surgeries include bilateral inguinal herniorrhaphies, bilateral knee arthroscopic surgeries along with ligament reconstruction, and open reduction and internal fixation of the right ankle fractures. (R. 201, 237).

6

Mr. Christie walked with a slow, very guarded, and antalgic gait. (R. 202). Dr. Tolentino found Mr. Christie's motor function in his lower extremities difficult to evaluate due to his severe pain. (R. 202). He further noted that, with regard to Mr. Christie's back, he had diffuse midline lumbosacral and bilateral paraspinal tenderness with the right side being worse than the left side, decreased reflexes, and straight leg raising limited to thirty degrees bilaterally with severe lower back pain. (R. 202).

Dr. Tolentino diagnosed Mr. Christie as having right lumbosacral radiculopathy, with severe disabling pain; lumbar myofascial pain syndrome; multiple disc bulges at L2-3, L3-4 and L4-5; cervical radicular syndrome; and clinical depression. (R. 202). Due to his severe, disabling pain, Dr. Tolentino admitted Mr. Christie into the hospital for acute pain management. (R. 202). He started him on a pain medication regimen of Neurontin[7], Zanaflex[8], and Zoloft[9] and scheduled him for a lumbar epidural steroid injection under fluoroscopy. (R. 202). Dr. Tolentino noted that, if Mr. Christie did not improve, he would require provocative discography to rule out internal disc disruption and would consider sending him for a clinical psychology evaluation for chronic pain due to his high BDI score. (R. 202).

Dr. Tolentino's treatment notes from August 23, 1999 indicate that Mr. Christie underwent a lumbar epidural steroid injection on August 20, 1999, due to his severe, disabling lower back pain

---

[7]Neurontin is a medication used to treat epilepsy and postherpetic neuralgia (pain). *Physicians' Desk Reference* 2590 (59th ed. 2005).

[8]Zanaflex is a medication prescribed to treat rigid muscles caused by spasticity. *Physicians' Desk Reference* 671 (55th ed. 2001).

[9]Zoloft is a medication prescribed to treat major depression, obsessive-compulsive disorders, and panic disorders. *PDR Family Guide*, at 774.

and sciatica. (R. 238). He was admitted to the hospital because he was unable to ambulate before the procedure. (R. 238). Mr. Christie was subsequently discharged from the hospital on August 21, 1999, at which time, his pain had decreased and he was able to ambulate, however, he was not entirely pain free. (R. 238). As of that date, Dr. Tolentino recommended repeating the epidural steroid injection under fluoroscopy approximately two weeks later. (R. 238).

On October 4, 1999, Mr. Christie saw Dr. Tolentino for follow-up treatment. (R. 237). At that time, Dr. Tolentino noted that Mr. Christie had two lumbar epidural steroid injections, with the most recent one on September 10, 1999, and he had fair improvement in his lower back pain and sciatica. (R. 237). He noted that Mr. Christie had new complaints of neck pain and right brachialgia, which had recently increased in severity. (R. 237). Dr. Tolentino found positive Tinel signs over Mr. Christie's median nerves in his hands, with the right being worse than the left. (R. 237). He diagnosed right cervical radiculopathy secondary to a herniated C5-6 disc; probable right carpal tunnel syndrome; and lumbosacral radiculopathy. (R. 237). Dr. Tolentino recommended that Mr. Christie have an EMG of his upper extremities and continue taking Neurontin, Zanaflex, and Zoloft. (R. 237). He would also consider whether Mr. Christie should have a cervical epidural steroid injection under fluoroscopy. (R. 237).

Dr. Tolentino's treatment notes from October 25, 1999, indicate that Mr. Christie obtained fair improvement following his first right cervical epidural steroid injection at C5-6 and noted that an October 7, 1999 EMG of his upper extremities was normal. (R. 236). Mr. Christie's examination showed normal range of motion of his neck with no focal tenderness or paraspinal spasms. (R. 236). Dr. Tolentino noted that Mr. Christie may have some weakness of his right hand grip and was a very anxious person. (R. 236). He gave him the option of having a second cervical epidural steroid

8

injection or considering cervical myelography and possible surgery. (R. 236). Mr. Christie decided to have a second injection before exercising the surgical option. (R. 236).

On November 4, 1999, Mr. Christie saw Dr. Michael Gitelis, M.D., an orthopedic surgeon, due to right knee swelling. (R. 470). Treatment notes indicate that he had a significant history of right knee swelling and Dr. Gitelis performed an arthroscopy and cartilage debridement of his right knee in 1998.[10] (R. 470, 476-77). Dr. Gitelis noted Mr. Christie's history of gout and aspirated his right knee. (R. 470). He indicated that it was likely that Mr. Christie's right knee swelling was an exacerbation of his gouty arthropathy. (R. 470). Dr. Gitelis prescribed Indocin[11], antibiotics, and medical tests. (R. 470).

Mr. Christie sought follow-up treatment for his knee condition on November 9, 1999. (R. 470). At that time, he reported that the tenderness in his right knee had significantly improved since he was last seen by Dr. Gitelis on November 4, 1999. (R. 470). Upon examination, Mr. Christie had full active extension and about 125 degrees of active flexion of the right knee. (R. 470). Treatment notes indicated that his right knee had significantly improved as a result of the aspiration and prescribed medications. (R. 470).

On November 15, 1999, Dr. Tolentino completed a Physical Ability Assessment form. (R. 513-14). Dr. Tolentino opined that Mr. Christie was capable of one hour of walking and standing and four hours of sitting in an eight-hour workday. (R. 513). He indicated that Mr. Christie could

---

[10]Plaintiff was treated for multiple knee problems by Dr. Gitelis in 1997 and 1998. (R. 470-78).

[11]Indocin (or Indomethacin) is a nonsteroidal anti-inflammatory medication used to relieve inflammation, swelling, stiffness, and joint pain associated with moderate or severe rheumatoid arthritis and osteoarthritis, and ankylosing spondylitis. *PDR Family Guide*, at 334. It is also used to treat bursitis, tendinitis, acute gouty arthritis, and other kinds of pain. *Id.*

9

lift and carry ten to twenty pounds occasionally; climb, balance, reach and finger (fine manipulation) occasionally; and never stoop, crouch, kneel, crawl, push, and pull. (R. 513-14). Dr. Tolentino further opined that Mr. Christie could only occasionally be exposed to environmental conditions, which included exposure to heat and cold extremes, wet and humid conditions, vibration, and moving mechanical parts. (R. 514).

Dr. Mansfield treated Mr. Christie on December 13, 1999. (R. 377). As of that date, Dr. Mansfield noted that Mr. Christie's neck and right arm had become much more symptomatic, and he still had some mild back and right leg pain. (R. 377). He indicated that Mr. Christie's pain in his neck radiated down much of his right arm, but not his left arm. (R. 377). Treatment options were discussed and Mr. Christie elected to proceed with a myelography. (R. 377).

On December 17, 1999, Mr. Christie saw Dr. Mansfield. (R. 377). He reviewed the results of his myelography which showed a right C5-6 defect with a spur and foraminal stenosis. (R. 377). Dr. Mansfield noted that surgery was warranted to correct the defect. (R. 377).

Mr. Christie underwent an anterior cervical microdiskectomy at the C5-6 level at Sherman Hospital on December 28, 1999. (R. 208, 212-17). Dr. Mansfield, who performed the microcervical diskectomy and foraminotomy, noted marked foraminal stenosis on the right and mild stenosis on the left. (R. 208). He also noted hip algesia of the right leg, decreased vibratory sensation in the right leg, moderately limited range of motion in the neck, and overall diagnoses of right C5-6 cervical spondylosis and lumbar myofascial syndrome. (R. 208-09, 214). Moreover, preoperative treatment notes indicated that Mr. Christie had neck and right arm pain that had not responded to outpatient conservative management which included epidural steroid injections. (R. 208, 209).

10

### 3.   2000

On January 13, 2000, Dr. Mansfield evaluated Mr. Christie's condition. (R. 378). Dr. Mansfield noted that his right arm pain was gone, but he had some neck stiffness and pain in his neck when he lies down. (R. 378). He indicated that Mr. Christie was taking Vicodin and occasionally took Motrin for his pain. (R. 378). Dr. Mansfield further noted that Mr. Christie had good mobility in his neck and encouraged him to be more active. (R. 378).

Mr. Christie sought treatment from Dr. Mansfield on January 18, 2000 due to severe lower back pain. (R. 378). As of that date, Dr. Mansfield noted that Mr. Christie's pain began several days earlier; however, there was no participating event. (R. 378). Upon examination, Dr. Mansfield found that Mr. Christie's walking was somewhat flexed and he had diffuse lumbar tenderness. (R. 378).

On January 24, 2000, Mr. Christie was treated by Dr. Tolentino for lower back pain. (R. 233). Upon examination, Dr. Tolentino noted that Mr. Christie stood with a bent over posture and his range of motion was markedly limited in his lower back. (R. 233). He found that Mr. Christie had bilateral lumbar paraspinal spasms, with the right worse than the left, but there was no focal tenderness on deep pressure. (R. 233). Dr. Tolentino further noted right sacroiliac and sacrosciatic notch tenderness, straight leg raising limited to fifty-five degrees on the right with posterior hip and lower back pain, and hypalgesia over the right L4-5 distribution. (R. 233). He recommended that Mr. Christie have another lumbar epidural steroid injection under fluoroscopy using a transcaudal approach and continue with his current medications which included Zanaflex, ibuprofen, Xanax[12],

---

[12]Xanax is a tranquilizer used to treat anxiety and panic disorders as well as other conditions. *PDR Family Guide*, at 752-53.

11

and Vicodin. (R. 233).

Mr. Christie underwent transcaudal right epidural steroid injections under fluroscopy at L3-4, L4-5 and L5-S1 on January 28, 2000. (R. 318).

On February 14, 2000, Dr. Tolentino treated Mr. Christie and noted that he had only partial improvement from the epidural steroid injections. (R. 232). An examination showed that Mr. Christie had a normal gait, but there was a moderate decrease in the range of motion in his lower back. (R. 232). He also had bilateral facet tenderness, with the right worse than the left, and most notably at the L4-5 and L5-S1 levels. (R. 232). Dr. Tolentino diagnosed Mr. Christie as having multi-level lumbar disc degeneration and recommended a diagnostic lumbar medial branch facet block under fluoroscopy. (R. 232).

Mr. Christie underwent diagnostic bilateral L3-4, L4-5, and L5-S1 medial branch facet nerve blocks under fluoroscopy on February 21, 2000. (R. 231, 521). Several days after the procedure, Dr. Tolentino noted that Mr. Christie had not obtained any significant relief, and his lower back pain was constant and increased with sitting as well as lying down (in one position) for prolonged periods. (R. 231). He recommended that Mr. Christie have another MRI of his lumbar spine. (R. 231).

On March 3, 2000, Mr. Christie had an MRI of his lumbar spine, which revealed mild disc degeneration at the L2-3 and L3-4 levels, with diminished signals. (R. 523). There were no disc protrusions, no evidence of spinal stenosis, and the posterior elements were unremarkable. (R. 523).

Mr. Christie underwent a psychological evaluation on April 8, 2000 at The Renz Addiction Counseling Center. (R. 357). His evaluation indicated that he had a dysphoric affect, fair judgment, and recurrent major depression. (R. 357). The medication he was taking for his depression (Zoloft) was increased at that time. (R. 357).

12

On April 18, 2000, Mr. Christie had a stress echocardiogram, which showed mild hypertension. (R. 189). His back was sore after ten minutes of exercise. (R. 189).

The next day, on April 19, 2000, Mr. Christie underwent a pain management evaluation with Dr. Joanna Barclay, M.D., a pain management specialist. (R. 228). Dr. Barclay noted that Mr. Christie suffered from intractable lower back pain, which had an unclear etiology. (R. 228). Upon examination, Dr. Barclay found that Mr. Christie had minimal tenderness in his lower back, positive straight leg raising on the right side in the sitting position as well as positive straight leg raising on the left side in the supine position, and muscle spasms. (R. 228). Dr. Barclay recommended that Mr. Christie undergo a differential spinal block and continue taking his same medications. (R. 228).

On May 8, 2000, Mr. Christie underwent three sequential lumbar epidural injections or spinal blocks. (R. 527).

Mr. Christie underwent a work capacity evaluation on May 11, 2000. (R. 251-68). The evaluators (an occupational therapist and physical therapist) noted that Mr. Christie's endurance was poor, his body mechanics were mostly safe, and his posture fluctuated from good to poor depending on the activity. (R. 251). They found that Mr. Christie was reluctant to exert maximum effort; walked with slumped shoulders and a shuffling, slow gait; and had a distressing pain level after the evaluation. (R. 251). It was noted that Mr. Christie demonstrated the ability to perform medium-level work occasionally; however, he was overweight, deconditioned, and a work hardening program was recommended. (R. 251).

The evaluators found that Mr. Christie could sit for about one-hour and forty-minutes without getting up, but needed to shift every thirty minutes; could walk for thirty minutes on a treadmill, but at varying speeds; could crawl, but at an excruciatingly slow pace; and could climb

13

stairs at a very slow pace. (R. 256-57). During the evaluation, it was noted that Mr. Christie had pain in his right lumbosacral region and was limited with only fifty percent forward bending; five percent backward bending; fifty percent side bending; and seventy-five percent rotation. (R. 258). It was further observed that straight leg raising on the right was positive in the sitting position, but was negative in the supine position; the Kernig test was positive for lower back pain; there was tenderness was noted in the right lumbosacral region of Mr. Christie's lower back; and his pain score was high. (R. 258-59). The evaluators found that, with regard to the ten-to-forty-inch lift test, Mr. Christie could lift up to forty-one pounds occasionally and twenty pounds frequently and, with regard to the table-to-shoulder lift test, he could lift up to thirty-two pounds occasionally and sixteen pounds frequently. (R. 261).

On May 31, 2000, Mr. Christie was discharged from therapy at the Renz Addiction Counseling Center where he was being treated for a gambling problem. (R. 588). His discharge summary noted that his attendance was poor which was partly due to medical reasons. (R. 588). Mr. Christie's prognosis was also considered poor due to a high-level of denial as well as his lack of commitment and follow-through with the treatment program. (R. 588).

Dr. Wang noted in a June 13, 2000 letter, that Mr. Christie was being treated for hyperlipidemia and he had a small, abdominal wall hernia. (R. 240). At that time, Dr. Wang indicated that Mr. Christie had recurrent chest pains, but had undergone cardiac catheterization and a stress echocardiogram, which were within normal limits. (R. 240). He further noted that Mr. Christie was being treated for back problems, but otherwise, he was doing quite well. (R. 240).

On June 30, 2000, Mr. Christie underwent a consultative psychiatric evaluation with Dr. Allan D. Nelson, M.D., a physician selected by the Bureau of Disability Determination Services

14

("DDS"). (R. 242-45). Mr. Christie described a history of chronic, severe lower back pain that radiated to both of his legs, which was not relieved by pain medications. (R. 242). He indicated that he also had sporadic neck pain, weakness in his right hand, and that all of these symptoms occurred suddenly while he was working about a year earlier. (R. 242). He further explained a history of chronic, moderate to severe depression and anxiety that had been present for years. (R. 242, 244). Mr. Christie indicated that his depression and anxiety symptoms had grown worse and were accompanied by persistent feelings of low self-esteem, difficulties in concentration, chronic insomnia, and a fair appetite. (R. 242, 244). He reported a past history of suicidal ideation and a long history of a gambling addiction. (R. 242, 244). Mr. Christie stated that he was taking Vioxx[13], Zanaflex, Zoloft, and Pravachol[14] for his conditions. (R. 243).

Dr. Nelson diagnosed Mr. Christie as having a depressive order, not otherwise specified; a passive-aggressive personality disorder; and a past history of chronic alcoholism that had been in remission for eight years. (R. 244). He noted that Mr. Christie walked with a slow and hesitant gait, and was moderately depressed, withdrawn, and preoccupied during the evaluation. (R. 243). Dr. Nelson further indicated that Mr. Christie's sporadic auditory and visual hallucinations were symptomatic of his depression and anxiety, and were not related to any psychotic disorder. (R. 244). He noted that Mr. Christie exhibited mild to moderate deficits in abstract functioning and his judgement was somewhat impaired, but there were no gross deficits in reality testing. (R. 244). Overall, Dr. Nelson found Mr. Christie's psychiatric prognosis to be guarded. (R. 245).

---

[13]Vioxx is a nonsteroidal anti-inflammatory medication used to treat osteoarthritis and other types of acute pain. *PDR Family Guide*, at 738.

[14]Pravachol is a medication prescribed to treat high cholesterol. *PDR Family Guide*, at 534.

On the same day, Mr. Christie saw Dr. Tolentino. (R. 248). As of that date, Dr. Tolentino noted that Mr. Christie had constant lower back pain and bilateral sacroiliac point tenderness with positive Gaenslen and Patrick signs. (R. 248). He indicated that a clinical psychology evaluation of Mr. Christie warranted the use of psychological behavior manipulation techniques as well as biofeedback training for stress management and depression. (R. 248). Dr. Tolentino recommended that Mr. Christie continue his pain medications and, if he was not better, he should undergo a left sacroiliac joint block under fluoroscopy. (R. 248).

On July 14, 2000, Mr. Christie underwent a left sacroiliac joint block under fluoroscopy. (R. 248).

Dr. Carl Hermsmeyer, Ph.D., a DDS psychologist, reviewed Mr. Christie's medical records and completed a Psychiatric Review Technique Form on August 16, 2000. (R. 269-77). Dr. Hermsmeyer assessed Mr. Christie's mental impairments under Listing 12.04, Affective Disorders, due to his depressive disorder; Listing 12.08, Personality Disorders, due to his inflexible and maladaptive personality traits[15]; and Listing 12.09, Substance Abuse Disorders, due to his past alcohol abuse. (R. 272, 274-75). Under Listing 12.09, Dr. Hermsmeyer evaluated Mr. Christie's functional limitations and found that he had slight limitations in activities of daily living and social functioning, and seldom had deficiencies in concentration, persistence, or pace. (R. 276).

On the same day, Dr. Hermsmeyer completed a Mental Residual Functional Capacity Assessment form. (R. 278-81). At that time, he determined that Mr. Christie was moderately limited in his ability to understand and remember detailed instructions and in his ability to carry out detailed

---

[15]Dr. Hermsmeyer indicated that Plaintiff had inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress which is evidenced by pathological dependence. (R. 274).

16

instructions. (R. 278). Dr. Hermsmeyer opined that Mr. Christie had the mental capacity to perform simple tasks. (R. 280).

On August 22, 2000, Mr. Christie saw Dr. Jeannie M. Waschow, D.P.M., for right big toe pain. (R. 356). He underwent right and left foot X-rays (which showed right ankle screws) and was diagnosed as having possible gout or hallux limitus. (R. 356). Mr. Christie received medication and information on how to control his gout and diet. (R. 356). Dr. Waschow treated Mr. Christie on August 29, 2000 and, at that time, explained that if his condition did not improve, he could undergo surgery to remodel the bone in his right foot. (R. 356).

Dr. E.C. Bone, M.D., a non-examining DDS physician reviewed Mr. Christie's medical records and completed a Physical Residual Functional Capacity Assessment form on August 23, 2000. (R. 282-89). Dr. Bone indicated that Mr. Christie could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; could stand and/or walk about six hours in an eight-hour workday; and could sit about six hours in an eight-hour workday. (R. 283). He indicated that Mr. Christie could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could only occasionally climb ladders, ropes and scaffolds. (R. 284). Dr. Bone noted that a physical capacity assessment performed on May 11, 2000 indicated that Mr. Christie could perform medium work as described by the Dictionary of Occupational Titles ("DOT"). (R. 289).

On September 28, 2000, Mr. Christie saw Dr. Mackdell Long, M.D., an emergency room physician, at Gateway Medical Center, due to toe pain in his left foot. (R. 491-96). Dr. Long noted swelling, tenderness, and slight bruising of Mr. Christie's left big toe. (R. 491). An X-ray of Mr. Christie's left foot showed soft tissue swelling of his big toe and some mild arthritic changes. (R. 491, 493). Dr. Long assessed him as having gout even though he was taking a low dosage of

17

Indomethacin. (R. 491). He recommended that Mr. Christie increase his dosage and prescribed a mid-strength narcotic pain medication. (R. 491). Dr. Long noted that Mr. Christie was also taking Allopurinol[16], Zoloft, Pravachol, and Zanaflex. (R. 491, 496).

Mr. Christie saw Dr. Tolentino on October 9, 2000, due to constant lower back pain and intermittent right leg pain. (R. 543). Upon examination, Dr. Tolentino noted a moderate limitation in the range of motion of the lower back, bilateral negative sacroiliac tenderness, moderate midline tenderness at the L2-3, L3-4, and L4-5 levels, and straight leg raising was limited to fifty-five degrees on the right with lower back pain. (R. 543). Dr. Tolentino recommended that Mr. Christie undergo provocative diskograms at the L2-3, L3-4 and L4-5 levels under fluoroscopy. (R. 543).

On October 17, 2000, Dr. Gitelis treated Mr. Christie. (R. 468). As of that date, Dr. Gitelis noted that Mr. Christie's toes were very quiescent and had residual stiffness from his gouty arthropathy. (R. 468). He diagnosed Mr. Christie with bilateral gouty arthropathy with multiple xanthoms. (R. 468). Dr. Gitelis referred him to a rheumatologist and recommended arthroscopy and debridement of the left knee. (R. 468).

Mr. Christie underwent a provocative diskogram at the L3-4 level which was performed by Dr. Tolentino on October 23, 2000. (R. 352). A similar procedure was attempted at the L4-5 level; however, it could not be done due to radicular pain at that level. (R. 352). Dr. Tolentino's notes further indicated that Mr. Christie had a very low pain threshold. (R. 352).

On November 1, 2000, Dr. Gitelis performed a left knee arthroscopy. (R. 466-67). The procedure entailed chondroplasty and lysis of adhesions of the left knee, removal of loose body

---

[16]Allopurinol is a medication used in the treatment of gout symptoms including acute attacks, tophi (a collection of uric acid crystals in the tissues, particularly around the joints), joint destruction, and uric acid stones. *PDR Family Guide*, at 783.

fragmentation of the knee, and removal of internal fixation of the knee (i.e., removal of prominent, two large size staples of the knee). (R. 466).

Dr. Tolentino treated Mr. Christie on November 9, 2000, and found that he continued to have significant lower back pain with spasms as well as lumbar radicular leg symptoms that were worse on the right. (R. 547). Mr. Christie rated his pain as an eight on a ten-point scale and had a significant sleep impairment. (R. 547). Dr. Tolentino prescribed Neurontin, Celebrex[17], Percocet[18], and Dalmane.[19] (R. 547).

On November 10, 2000, Mr. Christie sought treatment from Dr. Lee Lichtenberg, M.D., a rheumatologist. (R. 439-40). At that time, Dr. Lichtenberg noted that Mr. Christie had intermittent inflammation of his feet for many years and had taken Allopurinol for gout. (R. 439). He indicated that Mr. Christie had not worked for the past year due to back and sciatic-related pain. (R. 439). Dr. Lichtenberg noted that Mr. Christie took Indocin for acute inflammation of his feet. (R. 439). He also took Xanaflex, Vioxx or Celebrex on a daily basis, and Zoloft and oxycodone hydrochloride, as needed. (R. 439). His physical examination showed osteoarthritic changes of the first metatarsophalangeal joint with mild pes planus deformity bilaterally. (R. 439). Dr. Lichtenberg found the axial skeleton normal except for diminished lumbosacral motion and facet pain on hyperextension. (R. 439). He opined that gout was unlikely to be the cause of Mr. Christie's

---

[17]Celebrex is a nonsteroidal anti-inflammatory medication used to treat osteoarthritis and rheumatoid arthritis. *PDR Family Guide*, at 130.

[18]Percocet (or oxycodone hydrochloride) is a narcotic medication prescribed to treat moderate to moderately severe pain. *PDR Family Guide*, at 511.

[19]Dalmane is a medication used to treat insomnia, which includes difficulty falling asleep, waking up frequently at night, or waking up early in the morning. *PDR Family Guide*, at 183.

19

symptoms and that both his feet and back symptoms constituted the same problem. (R. 439). Thus, while Dr. Lichtenberg noted that Mr. Christie may occasionally have a gouty attack, his regular symptoms appeared to be more osteoarthritic. (R. 439).

Dr. Gitelis saw Mr. Christie on November 30, 2000. (R. 465). He found Mr. Christie's left knee to be better and noted he had nearly a full range of motion of the knee and no instability. (R. 465). Dr. Gitelis indicated that there was some swelling in the area where the staple was removed, but there was no erythema, redness, or infection. (R. 465). He noted that Mr. Christie should keep up with his physical therapy and should be able to go to progressive activities in about a month. (R. 465).

### 4. 2001

On January 9, 2001, Mr. Christie had a follow-up office visit with Dr. Gitelis. (R. 465). As of that date, Dr. Gitelis found that Mr. Christie had a little stiffness in his left knee, but he had good stability. (R. 465). He indicated that Mr. Christie should continue with physical therapy and then follow-up for a final check of his left knee. (R. 465).

Mr. Christie sought treatment from Dr. Gitelis on January 16, 2001 as a result of twisting his right knee. (R. 461). Upon examination, Dr. Gitelis found that Mr. Christie's right knee was swollen and he had a great deal of pain. (R. 461). An X-ray was performed which showed some mild degenerative changes. (R. 461). Dr. Gitelis aspirated the fluid from Mr. Christie's right knee and tested it to determine if the inflammation was due to a torn cartilage in the knee that was degenerative in nature. (R. 461). He recommended that Mr. Christie have an MRI to rule out a significant cartilage tear. (R. 461).

On January 18, 2001, Mr. Christie underwent an MRI of his right knee, which revealed a

20

large joint effusion with possible disruption of the superior fascicle horn medial meniscus and chondromalacia of the lateral patellar facet. (R. 438). On the same day, he saw Dr. Tolentino for chronic lower back pain and right sciatica. (R. 550). Dr. Tolentino noted that Mr. Christie walked with a markedly antalgic gait on the right side and used crutches to move around. (R. 550). He also indicated that Mr. Christie had slight midline lumbosacral and fascial tenderness; his right knee showed slight edema with right lateral, medial and infrapatellar tenderness; and his right big toe appeared edematous with marked tenderness. (R. 550). Dr. Tolentino's clinical impression was that Mr. Christie had chronic lower back pain and right sciatica, degenerative disc disease, recurrent right knee internal derangement, gouty arthritis with acute exacerbation, and painful right big toe. (R. 550). He recommended that Mr. Christie continue taking Neurontin, Celebrex, Percocet, and Allopurinol and be seen by Dr. Lichtenberg. (R. 550).

In January or February 2001, Mr. Christie underwent cartilage resection, repair, and debridement surgery of the right knee by Dr. Gitelis. (R. 460-62). Subsequent to his surgery, Mr. Christie was scheduled for rehabilitative physical therapy. (R. 552).

On March 30, 2001, Mr. Christie was evaluated by Dr. Larry B. Gelman, Psy.D. (R. 415-17). Dr. Gelman administered psychological tests and diagnosed Mr. Christie as having a recurrent major depressive disorder (which was mild by history), past alcohol abuse, pathological gambling, dyssomnia not otherwise specified, and a personality disorder not otherwise specified. (R. 416). He also noted that Mr. Christie had lower back and right leg pain, and may require additional back surgery. (R. 415). Dr. Gelman assessed Plaintiff's Global Assessment of Functioning ("GAF")

score to be 70.[20]  (R. 416).

Dr. Gelman completed a Psychiatric Review Technique form and noted that Mr. Christie's mental impairments fell under Listing 12.04, Affective Disorders, due a depressive syndrome characterized by appetite disturbances with changes in weight, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. (R. 421). He also assessed Mr. Christie's impairments under Listing 12.06, Anxiety Related Disorders, due to generalized persistent anxiety which was accompanied by apprehensive expectation; Listing 12.08, Personality Disorders, due to inflexible and maladaptive personality traits evidenced by dependent, compulsive and anti-social features; and under Listing 12.09, Substance Abuse, due to his past alcohol abuse and gambling addiction. (R. 416, 422-23, 425). Dr. Gelman found that, with respect to his mental impairments, Mr. Christie was slightly limited in his activities of daily living and seldom had deficiencies in concentration, persistence, or pace. (R. 424). He also determined that Mr. Christie was not significantly limited in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (R. 427-29).

On April 5, 2001, Mr. Christie underwent an MRI of his lumbar spine, which showed posterior disc bulges at the L2-3, L3-4 and L4-5 levels, with the most prominent at the L3-4 level. (R. 351, 557). Mild ventral effacement of the thecal sac and mild multilevel hypertrophy of the posterior elements were noted. (R. 351). He was viewed as having probable intractable pain

---

[20]GAF measures an individual's overall level of psychological, social, and occupational functioning. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (rev. 4th ed. 2000) ("*DSM-IV-TR*"). A GAF score in the range of 61 to 70 generally indicates an individual with "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

secondary to degenerative lumbar disc disease with disc protrusions, and a very low pain threshold which may have a functional component. (R. 557).

Mr. Christie had an EMG on April 11, 2001. (R. 301, 349). His EMG was normal; however, he was referred to Dr. Avi Bernstein, M.D., an orthopedic surgeon, who saw him on April 23, 2001, for an evaluation for possible spine surgery. (R. 301). After examining him, Dr. Bernstein noted that Mr. Christie suffered from lower back pain and radiculopathy due to an advanced degenerative condition of his lumbar spine. (R. 301). Dr. Bernstein reviewed Mr. Christie's MRI studies that showed advanced degenerative changes of his spine at the L3-5 levels and recommended posterior spinal fusion surgery with instrumentation and iliac crest bone grafting. (R. 301).

On May 9, 2001, Mr. Christie underwent a L3-5 lumbar spinal fusion, a L3-5 segmental instrumentation, and right iliac crest bone graft which was performed by Dr. Bernstein. (R. 335-37). Following the surgery, he had relatively mild hypotension as well as depression, gout and elevated cholesterol. (R. 347). Mr. Christie was given medications and physical therapy was ordered. (R. 319, 347).

Mr. Christie saw Dr. Bernstein on May 17, 2001 for follow-up treatment. (R. 300). As of that date, Dr. Bernstein noted that he had tenderness over the trochanteric bursa, had bursitis type symptoms, and prescribed a Medrol Dosepak.[21] (R. 300, 338). He indicated that Mr. Christie was doing quite well and X-rays showed that his instrumentation and plate were in good position. (R. 300, 338).

On July 5, 2001, Mr. Christie underwent a comprehensive assessment with Mary Cella, L.S.W., a therapist. (R. 607-11). Mr. Christie explained his history of back, neck and knee surgeries,

---

[21]Medrol is a corticosteroid medication used to treat rheumatoid arthritis, acute gouty arthritis, and severe cases of asthma. *PDR Family Guide*, at 395.

and indicated that he still experienced some occasional numbness and tingling from a nerve in his neck. (R. 609). He stated that he occasionally took Vicodin or a pill comparable to Tylenol #3 for pain as needed and, in the past, he had taken Zoloft, Paxil[22] and Klonopin.[23] (R. 609). Mr. Christie reported that he only slept about two to three hours each night and had problems with nutrition. (R. 609).

Ms. Cella found that Mr. Christie's cognitive functioning resulted in occasional problems with poor concentration, but he had no identifiable behavioral issues. (R. 610). Her overall impression was that Mr. Christie had a depressive disorder not otherwise specified, prior alcohol abuse, back and knee problems by history, poor social support, financial loss stressors, and a GAF of 55.[24] (R. 610). Ms. Cella recommended that Mr. Christie undergo a psychiatric evaluation and participate in individual and group therapy. (R. 611).

Mr. Christie began treatment with Dr. A. Martin, M.D., a psychiatrist, on July 31, 2001. (R. 604-06). After reviewing his past medical and psychiatric history, Dr. Martin prescribed Zoloft for Mr. Christie's depression because it had gotten worse since he stopped taking the medication. (R. 604-06). He agreed to combine treatment with psychotherapy. (R. 606).

On July 17, 2001, Mr. Christie reported that he had been involved in a hit and run car accident and was treated at Northwest Community Hospital. (R. 298, 300).

---

[22]Paxil is a medication prescribed to treat serious, continuing depression that interferes with an ability to function. *PDR Family Guide*, at 499.

[23]Klonopin is a medication prescribed to treat convulsive and panic disorders. *PDR Family Guide*, at 345.

[24]A GAF score in the range of 51 to 60 generally indicates an individual with "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV-TR* at 34.

24

Mr. Christie was admitted to Provena Saint Joseph Hospital on August 7, 2001, due to chest pain. (R. 635-36). He was diagnosed with acute bilateral pulmonary emboli (lung blood clots). (R. 618, 621, 635, 793). Mr. Christie was treated with Coumadin[25] and Heparin[26], and released from the hospital a week later. (R. 635-36).

Mr. Christie saw Dr. Martin on August 30, 2001. (R. 603). As of that date, Mr. Christie explained that he had been recently hospitalized for pulmonary emboli and indicated he was depressed due to many problems including his lack of insurance, financial difficulties, and physical condition. (R. 603). Subsequently, on September 26, 2001, Mr. Christie saw Dr. Martin, at which time, he reported that his mood had improved while taking Zoloft. (R. 602).

On September 17, 2001, Mr. Christie was treated by Dr. Benjamin S. Baltasar, M.D., an internist, for mildly elevated diabetes and hypercholesterolemia. (R. 565). He was next treated, on September 28, 2001, by Dr. Bernstein who noted that Mr. Christie's back and leg symptoms had worsened due to his car accident in July 2001. (R. 298).

Dr. Baltasar treated Mr. Christie on October 9, 2001. (R. 564-65). At that time, Dr. Baltasar noted that he had chest wall pain and tenderness, anemia, elevated creatin levels, and a history of pulmonary emboli. (R. 564-65). He prescribed Tylenol and Coumadin. (R. 564).

On October 16, 2001, Mr. Christie sought treatment for a right foot sprain at Sherman Hospital. (R. 728-32). He was given a prescription for Darvocet[27] and crutches. (R. 730).

---

[25]Coumadin is an anticoagulant (blood thinner) prescribed to prevent and/or treat a blood clot that has formed within a blood vessel or in the lungs. *PDR Family Guide*, at 169.

[26]Heparin is an anticoagulant (blood thinner) prescribed to prevent and/or treat a blood clot that has formed within a blood vessel or in the lungs. *Physicians' Desk Reference*, 1211 (55th ed. 2001).

[27]Darvocet is a mild narcotic medication used to treat mild to moderate pain. *PDR Family*

Mr. Christie saw Dr. Martin on November 8, 2001, at which time, he was taking Zoloft and his mood had improved. (R. 600).

Dr. Bernstein treated Mr. Christie on November 16, 2001. (R. 586). At that time, Dr. Bernstein noted that Mr. Christie was "doing reasonably well" and he is "capable of performing light duty work activity." (R. 586). He indicated that he would like to have Mr. Christie begin a physical therapy program. (R. 586).

On December 4, 2001, Mr. Christie twisted his left knee and was treated at Sherman Hospital for a tibial plateau fracture of his knee. (R. 692, 709-15). He was given a prescription for Tylenol #3 and advised to use crutches. (R. 710).

Mr. Christie was admitted to Sherman Hospital on December 8, 2001, at which time, he was diagnosed with acute left knee pain due to gouty arthritis and released from the hospital five days later. (R. 692).

On December 16, 2001, Mr. Christie saw Dr. Gitelis for follow-up treatment of his left knee injury. (R. 616). At that time, Dr. Gitelis noted that Mr. Christie had significant effusion of the knee and pain on the posterior aspect along the lateral hamstring. (R. 616). He determined that Mr. Christie had some kind of residual twist and ligament injury to the knee and prescribed anti-inflammatory as well as pain medication. (R. 616).

Mr. Christie was seen by Dr. Baltasar in December 2001 for left knee pain. (R. 703). He noted that Mr. Christie appeared to be in acute pain and his left knee was tender and contained fluid. (R. 703). Dr. Baltasar indicated that Mr. Christie had acute knee pain of an uncertain etiology, a history of pulmonary emboli, hypercholesterolemia, and depression. (R. 703). He noted that Mr.

---

*Guide*, at 184.

26

Christie was taking Pravachol, Zoloft and Coumadin for these conditions. (R. 703).

### 5. 2002

Mr. Christie had a follow-up visit with Dr. Martin on January 16, 2002. (R. 598). At that time, he explained that his mood had improved, but he still had financial difficulties. (R. 598). Dr. Martin noted that Mr. Christie was stable and had not experienced severe depression, anxiety, or panic attacks. (R. 598). He was instructed to continue taking Zoloft. (R. 598).

On February 14, 2002, Dr. Gitelis treated Mr. Christie for knee and back pain and diagnosed arthropathy of the medial compartment of the knee. (R. 616). Dr. Gitelis referred him for an EMG of his lower extremities. (R. 616).

Mr. Christie underwent an EMG on March 1, 2002. (R. 674). The results of the EMG were mildly abnormal with evidence of a chronic left S1 radiculopathy. (R. 674). Subsequently, on March 7, 2002, Dr. Gitelis recommended an epidural steroid injection. (R. 615).

On March 15, 2002, Mr. Christie saw Dr. Vincent P. Cannestra, M.D., an orthopedic surgeon, due to increased left knee difficulties. (R. 613-15). Dr. Cannestra noted that Mr. Christie had a previous history of chronic S1 radiculopathy of the left leg, posterior spinal fusion, two reconstructions of the left knee, deep vein thrombosus, and pulmonary emboli. (R. 615). He found him to have significant knee tenderness with patellofemoral compression and hip pain. (R. 614). Dr. Cannestra determined that Mr. Christie had degenerative joint disease of the left knee and recommended a total left knee arthroplasty. (R. 614).

Mr. Christie underwent a computed tomography ("CT") scan of his abdomen and pelvis on March 18, 2002. (R. 673). The CT showed a solid mass in the left kidney indicative of possible renal cell carcinoma, and inflammatory changes in the left lower quadrant indicative of possible

27

diverticulitis. (R. 673). He was not able to undergo left knee arthroplasty because of his pending surgery to resolve carcinoma of his kidney. (R. 613).

On March 18, 2002, Mr. Christie was treated at Sherman Hospital for lower abdomen pain. (R. 670). He was diagnosed with acute diverticulitis and a renal mass. (R. 670).

Mr. Christie underwent left nephrectomy surgery to remove his kidney due to renal cell carcinoma on April 12, 2002. (R. 657-59). He tolerated the procedure well and was released from the hospital on April 18, 2002. (R. 665).

On April 21, 2002, Mr. Christie was admitted to Sherman Hospital where he was treated for shortness of breath and anemia, and a pulmonary embolism. (R. 647-48). He was given Heparin in conjunction with Coumadin, which he was already taking. (R. 647). Mr. Christie was released from the hospital on April 30, 2002. (R. 647-48).

Dr. Baltasar completed a Physical Residual Functional Capacity Questionnaire on August 4, 2002 stating that Mr. Christie had hypertension, gouty arthritis, a history of pulmonary emboli, chest, joint, knee and big toe pain, and his prognosis was fair. (R. 560-63). He indicated that Mr. Christie suffered from depression and was capable of low stress jobs, but his symptoms often interfered with his attention and concentration. (R. 561). Dr. Baltasar indicated that Mr. Christie could sit, stand, and walk for a total of about four hours in an eight-hour workday, could continuously sit and stand at one time for more than two hours in an eight-hour workday, would need to shift or change positions at will, would need to walk around every fifteen minutes for seven minutes at a time, and would need to take two to three unscheduled ten minute breaks during an eight-hour workday. (R. 561-62). He noted that Mr. Christie could lift and carry up to ten pounds frequently and twenty pounds occasionally. (R. 562). Dr. Baltasar further opined that he could bend

28

and twist thirty percent of the time during an eight-hour workday, and reach eighty percent of the time during an eight-hour workday, and would likely be absent from work more than three times a month due to his impairments.[28] (R. 563).

## B.
## The Plaintiff's Testimony At The Hearing

Mr. Christie, who was born on January 25, 1951, was fifty-one years old at the time of the administrative hearing. (R. 969-70). He testified that he has an Associates Degree in Art and his past work consisted primarily of delivery jobs. (R. 970). Mr. Christie stated that he had performed odd jobs since the onset date of his disability which included driving a hearse or delivering wine, but that he only did these jobs a few times a year and made less than $100.00 from each of them. (R. 971).

Mr. Christie testified that he stopped working in May 1999 when, during his last job delivering for Fuji, he experienced sudden weakness while driving, lost all feeling in his leg, and could not hold his clipboard. (R. 971-72). He stated that, at that time, he did not have back pain, but his back pain developed over time due to all of the lifting he has done. (R. 972). Mr. Christie indicated that he had surgery on his neck to relieve pressure in his right hand and had epidural shots for pain in both his lower back and right leg. (R. 972-73). He stated that prior to his back surgery in May 2001 that lifting even light weights would throw his back out, and he had difficulty bending and no strength in his back. (R. 973). Mr. Christie explained that his right knee gave him problems "on and off" and that it would calm down for a while and "act up" every now and then. (R. 973).

In August 2001, following Mr. Christie's back surgery, he indicated that he had blood clots,

---

[28]In his memorandum, Mr. Christie delineates additional medical evidence; however, this evidence was submitted to the Appeals Council and was not before the ALJ. (Pl.'s Mem. at 9-10).

leg pain and swelling, gout flare-ups, and knee problems. (R. 974-75). He described his leg pain as "like a vice tightening" and his gout caused toe swelling that caused pain whenever he touched or bumped his toes sending "so much pain up and down [his] whole body" which could last a couple days, a week or longer. (R. 975). Mr. Christie stated that he had a flare-up of his gout the week before the hearing that lasted a couple of hours; however, he had not had a flare-up since the previous year. (R. 993). He indicated that he took Allopurinol everyday for his gout and when he had a flare-up he took additional medication. (R. 993-94).

Mr. Christie testified that there is virtually no cartilage in his left knee and he has constant pain which is caused by bone-on-bone rubbing. (R. 975-76). He described the pain as "vice-like" and at times he would have to sit down and put ice on it because he could not walk. (R. 976). Mr. Christie stated that he had been scheduled for knee replacement surgery when his kidney cancer was discovered. (R. 976). He had surgery to remove his left kidney and, during the surgery, the surgeons hit an artery which resulted in constant sharp or stabbing pain in that area. (R. 976-77). Mr. Christie indicated that he had recently gone to the emergency room for his side pain and took Darvocet, Vicodin or Tylenol to relieve the pain, but that these medications only gave him temporary relief. (R. 977). He further testified that he did not know when he would have knee replacement surgery. (R. 977).

Mr. Christie described his depression as a feeling of "being in a corner" or having a "wall around [him]" and no matter what he tried to do to get out, he could not do so. (R. 978). He feels like he is "boxed in," does not care about anything, and does not want to be bothered by anyone. (R. 978). Mr. Christie testified that he felt this way two or three times a week. (R. 978). He stated that Zoloft helped ease his stress and tension, but not his feeling of being down or of being "boxed in."

30

(R. 978). Mr. Christie explained that when he felt "boxed in" he would go into his room, lock the door, and just sit there or lay down. (R. 978). He testified that he talks with a counselor every two weeks. (R. 979). Mr. Christie stated that he has concentration problems and explained that he has "no direct focus on anything," can only sleep two to four hours a night, and has flashbacks that are "like harassment" that keep him awake at night. (R. 979-81).

Mr. Christie testified that he has arm and hand problems and finds that, a few times a day, he could not pick up a piece of paper because he has no strength in his left hand or any feeling in it. (R. 981-82). He stated that he sometimes drops small items (e.g., pens or pencils) with his left hand, but this just began to occur about a month before the hearing. (R. 982). Mr. Christie also explained that he experienced numbness and tingling in his right hand once a week or several times a month. (R. 982). He indicated that he continued to have chest pains that occurred "off and on" regardless of his activity that lasted anywhere from one minute to ten minutes. (R. 982-83, 992-93).

With regard to his limitations, Mr. Christie testified that he can sit for about an hour before he has to get up and stand for about an hour. (R. 984-85). He indicated that usually every hour he was doing something; such as, sitting, standing or trying to walk a little. (R. 985). Mr. Christie explained that he could maybe walk a mile, but then his leg would start to bother him. (R. 985). He stated that he could lift no more than ten pounds. (R. 985). Mr. Christie further testified that driving for over an hour caused his back and legs to stiffen up and he would have to get out and stretch. (R. 987, 995-96).

When questioned about his daily activities, Mr. Christie stated that, unless he got a call to drive a hearse for a funeral or to deliver something, he would do things around the house like clean the bathroom, wash dishes, sweep or mop. (R. 985). He also explained that sometimes he went out

31

and took pictures of terrains, old farms, or eagles. (R. 985-86). Mr. Christie testified that he does his own laundry, but that he has someone else carry it up and down the stairs. (R. 986). He stated that his mother normally did the cooking and his mother or sister-in-law did the grocery shopping. (R. 986). Mr. Christie explained that if he did go grocery shopping, he would typically just get a small bag of fruit or other items. (R. 986). He testified that when he drove to the hearing that day, which took him more than an hour, he stopped to stretch because he was getting stiff. (R. 986-87). Mr. Christie stated that when he drove to Branson, Missouri he would make frequent stops (about every hour); however, when he drove to Wisconsin, he would not stop if he was going to Lake Geneva, but he may stop if he was going to the Milwaukee area. (R. 991-92, 995-96). He further indicated that he last drove a hearse a month before the hearing and delivered wine the prior year. (R. 988-90).

### C.
### The Medical Expert's Testimony

Dr. Mark Oberlander, a psychologist, testified as a medical expert at the administrative hearing. (R. 996-1000). Dr. Oberlander initially stated that Mr. Christie's medical record suggested that his mental impairments fell under three different listings; namely, Listing 12.04 Affective Disorders, Listing 12.08 Personality Disorders; and Listing 12.09 Substance Abuse Disorders. (R. 997). He testified, however, that the severity of Mr. Christie's impairments, even in combination, did not meet or equal the requirements of any listing. (R. 997). Dr. Oberlander further stated that, with respect to the severity criteria of these listings, Mr. Christie had mild restrictions in activities of daily living and in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. (R. 998).

When asked to identify Mr. Christie's work limitations, Dr. Oberlander stated that it was very "difficult to tease out [the effect his mental impairments have on his ability to work] because of the multitude of physical difficulties." (R. 998). Dr. Oberlander directed the ALJ's attention to Dr. Gelman's 2001 psychological evaluation and the activities Mr. Christie reported at that time, and stated that it was "hard to tell where [his] limitations fit in" when Mr. Christie made statements that he can stay focused enough to drive and go to casinos. (R. 999). He indicated that Dr. Gelman identified no limitations; however, Dr. Oberlander determined that, after hearing Mr. Christie's testimony, he has moderate limitations in his ability to understand and remember detailed instructions and in his ability to carry out detailed instructions. (R. 999). Dr. Oberlander further testified that an affective or personality disorder could exacerbate an individual's (with the same type of physical problems as Mr. Christie) experience of pain and other symptoms. (R. 1000).

## D.
## The Vocational Expert's Testimony

Christopher J. Yep, a vocational expert, testified initially that Mr. Christie's past work was unskilled and ranged in exertional level from light to heavy. (R. 1001). The ALJ posed a hypothetical question to Mr. Yep and asked whether there were any jobs available for an individual of Mr. Christie's age (i.e., forty-eight to fifty-one years old), education, and past work experience who could lift up to twenty pounds occasionally and ten pounds frequently; could bend, climb, and crouch occasionally; and could sit, stand, or walk as required, but who could not perform detailed and/or complex tasks. (R. 1001). In response, Mr. Yep stated that such an individual could perform Mr. Christie's past work as a pizza delivery person. (R. 1001). The ALJ next modified the hypothetical question by adding that this individual could stand or walk for six hours in an eight-hour

33

workday, but only for an hour at a time before he must change positions, and could not work with pneumatic or vibratory equipment. (R. 1001). Mr. Yep responded that based on this criteria that the pizza delivery job would be eliminated, but that the individual could perform work as an assembler and sorter. (R. 1001-02). He further stated that because of Mr. Christie's limitations in standing and walking, he was giving the ALJ sedentary numbers for these jobs which were 26,198 jobs for assembly work and 9,783 jobs for sorting work. (R. 1002).

The ALJ then questioned Mr. Yep to make sure he took into account his statements that the individual could stand or walk for six hours in an eight-hour workday, but for only one hour at a time before the individual would have to change positions briefly. (R. 1002). In response, Mr. Yep stated that this would change his answer to include light work numbers which meant there were 65,494 assembler positions and 24,457 sorter positions. (R. 1002). The ALJ asked Mr. Yep whether the characteristics of the hypothetical individual he described were consistent with how these jobs were defined or described in the *Dictionary of Occupational Titles* ("DOT"), to which he responded affirmatively. (R. 1003). Finally, the ALJ asked Mr. Yep whether the hypothetical individual would be able to perform any jobs if he required breaks, at will, for up to ten minutes at a time. (R. 1003). Mr. Yep responded that, due to the frequency of the breaks, the individual would *not* be able to perform any jobs. (R. 1003).

Mr. Christie's attorney next questioned Mr. Yep and asked him for the DOT numbers for the jobs he identified. (R. 1003). In response, he stated that the DOT number for the assembler job was 734.687-018 and the DOT number for the sorter job was 734.687-082. (R. 1003). Mr. Christie's attorney then asked Mr. Yep if the hypothetical individual could perform those jobs he had identified if he had numbness and tingling in the dominant right hand on and off throughout the day one day

34

out of the week. (R. 1003). Additionally, Mr. Christie's counsel stated that the individual would also have diminished strength in his left hand, difficulty grasping and holding on to objects regardless of the weight, and may also drop the objects. (R. 1003-04). Mr. Yep stated that, if the hypothetical individual had inconsistent use of his right hand one day out of the week in combination with his left hand problems, he would *not* be able to perform the jobs he identified. (R. 1004). Mr. Christie's attorney further asked Mr. Yep if the jobs he identified were unskilled jobs, to which he responded affirmatively. (R. 1004). Finally, his attorney asked, on average, how many days the hypothetical individual could be absent from the workplace and still sustain employment. (R. 1004). Mr. Yep responded that employers would tolerate an absenteeism rate of one day per month or twelve days per year. (R. 1004-05).

### III.
### THE ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that Mr. Christie had not engaged in substantial gainful activity since May 1999, when he alleges he became disabled. (R. 22, 28). Next, she determined that Mr. Christie had the following impairments: (1) arthritis in the left knee with a history of multiple surgeries to both knees; (2) degenerative disc disease of the cervical and lumbar spines with a history cervical spine surgery in December 1999 and lumbar spine surgery in May 2001; (3) affective disorder; (4) personality disorder; (5) a history of alcohol abuse and dependence; (6) gout affecting the toes; (7) a history of pulmonary embolism in August 2001 and April 2002; and (8) cancer of the kidney. (R. 28). These impairments, according to the ALJ, met the Agency's requirement that a severe impairment significantly limit the ability to perform basic work activities. (R. 22, 28). *See* 20 C.F.R. § 404.1520(c). The ALJ further determined, however, that none of Mr. Christie's impairments, either

singly or in combination, met or equaled an impairment listed in the Agency's regulations as disabling. (R. 22, 28). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments.

The ALJ then assessed Mr. Christie's residual functional capacity ("RFC"). In so doing, she initially indicated that Mr. Christie had a significant problem with lower back pain and noted that his alleged onset of disability coincided with the start of his complaints of severe lower back pain in May 1999. (R. 23). The ALJ noted that the objective medical evidence showed diffuse disc bulging at three levels of Mr. Christie's lumbar spine and the examination findings in August 1999 indicated tenderness, spasms and significantly limited straight leg raising. (R. 23-24). She explained that Mr. Christie's lumbar pain responded fairly well to epidural steroid injections; however, because his cervical pain did not respond to such treatment, he required surgery in December 1999. (R. 24).

The ALJ found that the medical evidence showed in 2000 that Mr. Christie's cervical surgery had excellent results, but his constant lower back pain and intermittent right sciatica recurred. (R. 24). She next discussed the examination findings and treatment for Mr. Christie's lumbar symptoms which indicated that his symptoms had improved in early 2000, but regressed soon afterwards and he again complained of intractable lower back pain. (R. 24).

The ALJ discussed the fact that an MRI of Mr. Christie's lumbar spine in August 2000 showed degenerative changes and desiccation at the L4-5 level and, in May 2001, he had a lumbar fusion at the L3 to L5 levels with instrumentation and iliac crest bone grafting. (R. 24). She noted that Mr. Christie did fairly well after his surgery until he had a car accident in July 2001 and reported an increase in his back pain. (R. 24). The ALJ pointed out that Mr. Christie was again referred for physical therapy and, by August 2001, his back pain had significantly improved. (R. 24). She, acknowledged in March 2002 that test results showed a persistent left S1 radiculopathy. (R. 24).

36

The ALJ noted that Mr. Christie had a long history of intermittent knee problems and had left knee arthroscopy in November 2000, at which time, he achieved nearly a full range of motion without any instability. (R. 24). She discussed the fact that, in January 2001, Mr. Christie twisted his right knee and X-rays showed only mild degenerative changes. (R. 24). The ALJ indicated that Mr. Christie was later hospitalized when he fell down and twisted his left knee. (R. 24). At that time, X-rays showed significant arthropathy and joint reconstruction surgery was scheduled; however, due to the fact that Mr. Christie was diagnosed with kidney cancer, the knee surgery was postponed. (R. 24). She noted that one of Mr. Christie's kidneys was removed , and his complaints of ongoing side pain after the surgery were not substantiated in the medical record. (R. 24). The ALJ also discussed Mr. Christie's gout and noted that he had flare-ups of this condition in August and September 2000, but he did not have a recurrence until a year later. (R. 25). She noted that medical records showed Mr. Christie had pulmonary embolisms in August 2001 and April 2002; however, there was no indication that these resulted in any functional limitations. (R. 25).

The ALJ indicated that Mr. Christie had been diagnosed with a depressive disorder, a passive-aggressive personality disorder, and chronic alcoholism in remission. (R. 24-25). She discussed Mr. Christie's depressive symptoms which included feelings of hopelessness and helplessness, intermittent anxiety, poor sleep, low self-esteem, difficulty with concentration, and insomnia. (R. 24-25). The ALJ pointed out, however, that despite these diagnoses an examining psychologist concluded that Mr. Christie had no related functional limitations. (R. 25). She further noted that Mr. Christie resumed mental health treatment in July 2001 and, after his antidepressant medication (Zoloft) was reinstated, his mood improved. (R. 25).

37

The ALJ determined that despite the many medical problems Mr. Christie had endured over the years, his conditions were "substantially ameliorated" with treatment. (R. 26). She noted Dr. Baltasar found that Mr. Christie was capable of low stress jobs; Dr. Bernstein felt he was capable of light duty work; and a work evaluation indicated that he was capable of medium work. (R. 26). As a result, the ALJ determined that Mr. Christie's "medically determinable impairments preclude[d] the following work related activities: lifting more than 20 pounds occasionally or 10 pounds frequently; bending, crouching, or climbing more than occasionally; operating pneumatic or vibratory equipment; and understanding, remembering and/or carrying out detailed or complex instructions." (R. 22, 28). She also found that Mr. Christie "must alternate between sitting and standing every hour." (R. 22, 28). Based on these limitations, the ALJ assessed Mr. Christie as being able to perform a limited range of light work. (R. 28).

The ALJ next assessed Mr. Christie's symptoms and complaints and considered the factors in 20 C.F.R. § 404.1529(c)(3) and Social Security Ruling ("SSR") 96-7p. (R. 25-27). According to the ALJ, Mr. Christie's testimony about the nature and degree of his physical limitations were not fully credible based on the evidence in the record. (R. 25, 28). For example, the ALJ discussed Mr. Christie's daily activities and noted that he engaged in a wide-range of activities, which included driving a hearse or making deliveries when he was called to do so. (R. 25). Regarding Mr. Christie's mental limitations, the ALJ found that he was no more than mildly restricted because he left home on a daily basis and interacted with others. (R. 26).[29] She noted that Mr. Christie had no more than occasional problems with concentration, persistence and pace because he was focused enough to

_____

[29] As discussed *infra*, if this conclusion were accepted as outcome-determinative, only the most grossly impaired individuals could qualify for benefits. Neither the Regulations nor the cases support so radical a departure from the system crafted by the Congress and the Social Security Administration.

38

drive and made a long-distance trip to Missouri in June 2001. (R. 26). The ALJ indicated that Mr. Christie could still walk a mile and required no assistive device. (R. 26). She also noted that there were significant credibility issues because his gambling problem caused him to drive "all over" to various casinos. (R. 26-27).

Given Mr. Christie's RFC, the ALJ next evaluated his ability to perform any past relevant work. (R. 27). She adopted Mr. Yep's opinion that Mr. Christie could not perform his past relevant work and then considered whether he could perform other jobs that existed in significant numbers in the economy. (R. 27, 28). Considering the fact that Mr. Christie was approaching advanced age, had a college degree, his past relevant work was unskilled, had the capacity to perform a limited range of light work, the ALJ employed the Medical-Vocational guidelines (i.e., Rules 202.13 and 202.20) as a framework to find that Mr. Christie was not disabled. (R. 27, 28). However, because Mr. Christie's RFC limitations did not exactly coincide with those under Rules 202.13 and 202.20, the ALJ relied upon Mr. Yep's testimony that a hypothetical individual with Mr. Christie's limitations could perform "light" jobs of assembler (65,494 jobs in the State of Illinois) and sorter (24,457 jobs). (R. 27, 28.) The ALJ noted that Mr. Yep testified that the exertional and nonexertional requirements of these jobs, as described in the DOT, are consistent with Mr. Christie's RFC. (R. 27). As a result, the ALJ found that Mr. Christie was not disabled and was not entitled to DIB under the Act. (R. 28, 29).

## IV.
## DISCUSSION
### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The

39

court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). The court may not reweigh the evidence or substitute its judgment for that of the Social Security Administration. *Binion*, 108 F.3d at 782. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.*

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must have "articulated" the reasons for her decision at "some minimum level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Id. See also Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).[30] Although the ALJ need not address every piece of evidence, the ALJ cannot limit her discussion to only that evidence that supports her

---

[30] The requirement that ALJs must explain the reasoning that led to a particular conclusion is neither unique to ALJs nor does it impose some heightened obligation on them. The principle governs decision-making at all levels of the federal judiciary as well. *See, e.g., United States v. Elliott*, 467 F.3d 688, 690 (7th Cir. 2006); *Szmaj v. AT&T*, 291 F.3d 955, 956 (7th Cir. 2002)(Posner, J.)(Referring to a particular case as weak authority "because there is no discussion of the point, only a conclusion."); *United States v. Eiselt*, 988 F.2d 677, 680 (7th Cir. 1993)("'Reasons' means something more than conclusions-a distinction important not only to the defendant . . . but also to the appellate process."). *Cf. Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171, 71 S.Ct. 624, 95 L.Ed. 817 (1951)(Frankfurter, J., concurring)(the validity and moral authority of any conclusion largely depends on the mode by which it was reached); Henry M. Hart, Jr., *Foreword: The Time Chart Of The Justices*, 73 Harv.L.Rev. 84, 98-99 (1959)("In the end, however, *ipse dixits* are futile as instruments for the exercise of 'the judicial Power of the United States.'").

ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of her findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595.

**B.**
**The Required Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;
2) does the plaintiff have a severe impairment;
3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
4) is the plaintiff unable to perform his past relevant work; and
5) is the plaintiff unable to perform any other work in the national economy.

20 C.F.R. § 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352; *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

**C.**
**Analysis**

Mr. Christie advances three arguments for reversal or remand of the ALJ's decision. First, the ALJ erred in her RFC finding because she ignored substantial evidence in the record. Second,

the ALJ's credibility determination was erroneous because she did not follow SSR 96-7p as she was required to do and the credibility determination was not supported by record evidence. Lastly, the ALJ wrongly found Mr. Christie capable of performing work as a sorter and assembler based upon the erroneous testimony of Mr. Yep. *(See Pl.'s Mem. and Pl.'s Reply).*

## 1.
## The ALJ Erred In Her RFC Finding of Mr. Christie

Mr. Christie avers that the ALJ erred in finding that he could perform a limited range of light work because she ignored substantial medical evidence in the record that was favorable to him. (Pl.'s Mem. at 14-19, Pl.'s Reply at 1-11). He contends that the ALJ's RFC assessment was improper because she failed to explain what evidence contradicted his disabling impairments and ignored legitimate objective medical findings in favor of her own amateur medical opinion. (Pl.'s Mem. at 15). Thus, according to Mr. Christie, the ALJ ignored evidence of his continuing and unrelenting lower back and cervical pain despite his surgeries and other treatment which resulted in greater limitations than she found. *(Id.* at 15). Mr. Christie further asserts that the ALJ ignored his need to sit and stand at will as well as take unscheduled breaks and inadequately assessed his mental impairments. *(Id.* at 17).

The Commissioner, on the other hand, argues that the ALJ properly evaluated the medical evidence of Mr. Christie's physical and mental impairments. (Def.'s Mem. at 6-9). Specifically, the Commissioner avers that the ALJ did not ignore the medical evidence, but rather summarized Mr. Christie's medical evaluations and treatment in her decision instead of recounting the enormous record in detail. *(Id.* at 6-7). The Commissioner contends that the ALJ's decision to summarize rather than recite the medical record in this case was appropriate in light of the ever-increasing

number of requests for hearings as well as the needs of other claimants for timely decisions. (*Id.* at 6 n.2). Thus, according to the Commissioner, because the ALJ's summary is accurate and gives the reviewing court a clear picture of how she viewed the record, she committed no error in presenting the evidence in this way. (*Id.* at 7). Therefore, the Commissioner avers that the ALJ's RFC finding was correct because she summarized and explained her conclusions that, despite Mr. Christie's multiple medical problems over the years, his conditions were "substantially ameliorated" with treatment. (*Id.* at 9).

A review of the 1,006-page record shows that Mr. Christie has a multitude of severe medical impairments which include back, neck, leg, knee, arm, hand and mental impairments as well as significant pain that are substantiated by a myriad of medical records. The record further discloses that Mr. Christie was treated by twenty different medical professionals and was prescribed twenty-two different types of medications to treat his various impairments. Because the ALJ summarized much of the medical evidence in her nine-page decision, she failed to sufficiently explain her basis for rejecting certain pieces of medical evidence and ignored substantial evidence when she assessed Mr. Christie's RFC.

With regard to the ALJ's RFC finding, she determined that Mr. Christie's "medically determinable impairments preclude[d] the following work related activities: lifting more than 20 pounds occasionally or 10 pounds frequently; bending, crouching, or climbing more than occasionally; operating pneumatic or vibratory equipment; and understanding, remembering and/or carrying out detailed or complex instructions." (R. 22, 28). She also found that Mr. Christie "must alternate between sitting and standing every hour." (R. 22, 28). Based on these limitations, the ALJ

43

assessed Mr. Christie as being able to perform a limited range of light work.[31] (R. 28).

A review of the record discloses that the ALJ indeed ignored substantial evidence contrary to her conclusions. There was record evidence that Mr. Christie experienced numbness and tingling in his right hand once a week or several times a month. (R. 982). Mr. Christie sometimes dropped small items (e.g., pens or pencils) with his left hand, which began about a month before the hearing. (R. 982). Also, a few times a day Mr. Christie could not pick up a piece of paper because he has no strength in his left hand or any feeling in it. (R. 981-82).[32] On this point, the vocational expert, Mr. Yep testified that, under the facts in this case, if an individual such as Mr. Christie had inconsistent use of his right hand one day a week in combination with his left hand problems, there would be no jobs that he could perform. (R. 1004). Specifically, Mr. Christie would not be able to perform the assembler and sorter jobs the ALJ determined he could perform.[33] (R. 1004). The ALJ, however, did not address the hand issue.

---

[31] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). SSR 83-10 further provides that "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10. Moreover, "to perform substantially all of the exertional requirements of most . . . light jobs, a person would not need to crouch and would need to stoop only occasionally (from very little up to one-third of the time, depending on the particular job)." SSR 83-14.

[32] This was Mr. Christie's testimony.

[33] It must be noted that the ALJ generally found that Mr. Christie was not entirely credible for the reasons stated in the record. The ALJ, however, did not specifically discuss whether the hand evidence recited above was credible or not. There is medical evidence that is discussed later in this opinion that Mr. Christie did have hand problems. Accordingly, on remand, the ALJ needs to specifically address whether the hand evidence was credible for purposes of the issue raised above.

Next, the evidence supports the conclusion that Mr. Christie needed to take breaks at will. (R. 562). Dr. Baltasar opined that Mr. Christie would need to walk around every fifteen minutes for seven minutes at a time during an eight-hour workday, and he would need to take two to three unscheduled ten minute breaks during an eight-hour workday.[34] (R. 562). Significantly, Mr. Yep testified that if an individual such as Mr. Christie required breaks, at will, for up to ten minutes at a time, that due to the frequency of the breaks, the individual would not be able to perform any jobs. (R. 1003). The ALJ, however, did not address the "at-will break" evidence issue. Accordingly, a remand is necessary for the ALJ to address (and, if tenable, further develop) these issues. *See e.g.*, *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001)("[A]n ALJ may not ignore an entire line of evidence that is contrary to her findings, . . . rather she must 'articulate at some minimal level [her] analysis of the evidence.'"); *Herron*, 19 F.3d at 333 ("meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence").

Moreover, in her decision, the ALJ's discussion of the medical records is incomplete, and she ignored the medical evidence from Drs. Tolentino and Baltasar[35] that show Mr. Christie to be more limited than the ALJ found him to be in her RFC.[36] (R. 22, 28). For example, on November 15, 1999, Dr. Tolentino opined that Mr. Christie was only capable of one hour of walking and one

---

[34] Dr. Baltasar also opined that Mr. Christie could continuously sit and stand at one time for more than two hours. (R. 561).

[35] Drs. Tolentino and Baltasar are two of Mr. Christie's treating physicians.

[36] With regard to the ALJ's RFC finding, she determined that Mr. Christie's "medically determinable impairments preclude[d] the following work related activities: lifting more than 20 pounds occasionally or 10 pounds frequently; bending, crouching, or climbing more than occasionally; operating pneumatic or vibratory equipment; and understanding, remembering and/or carrying out detailed or complex instructions." (R. 22, 28). She also found that Mr. Christie "must alternate between sitting and standing every hour." (R. 22, 28). Based on these limitations, the ALJ assessed Mr. Christie as being able to perform a limited range of light work. (R. 28).

45

hour of standing in an eight-hour workday and four hours of sitting in an eight-hour workday. (R. 513). He further indicated that Mr. Christie could lift and carry ten to twenty pounds occasionally; climb, balance, reach and finger (fine manipulation) occasionally; never stoop, crouch, kneel, crawl, push and pull; and could only occasionally be exposed to environmental conditions, which included exposure to extremes in heat and cold, wet and humid conditions, vibration, and moving mechanical parts. (R. 513-14).

Dr. Baltasar opined that Mr. Christie could sit, stand, and walk for a total of about four hours in an eight-hour workday, would need to shift or change positions at will, would need to walk around every fifteen minutes for seven minutes at a time, and would need to take two to three unscheduled ten minute breaks during an eight-hour workday.[37] (R. 561-62). He indicated that Mr. Christie could bend and twist thirty percent of the time during an eight-hour workday, and reach eighty percent of the time during an eight-hour workday, and would likely be absent from work more than three times a month due to his impairments. (R. 563). Dr. Baltasar further opined that Mr. Christie was capable of performing low stress jobs; however, his pain and other symptoms would often interfere with his attention and concentration. (R. 561). Accordingly, these assessments are more limiting than the ALJ's RFC finding and is contrary to the Commissioner's contention that, "on the whole," the ALJ adopted the findings of Dr. Baltasar. (Def.'s Mem. at 12).[38]

---

[37] Dr. Baltasar also opined that Mr. Christie could continuously sit and stand at one time for more than two hours. (R. 561).

[38] A treating physician's opinion regarding the nature and severity of a medical condition is generally (but not inevitably, *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *Rogers v. Barnhart*, 446 F.Supp.2d 828, 852 (N.D.Ill. 2006)), entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (*citing* 20 C.F.R. § 404.1527(d)(2)); SSR 96-2p.). The SSA regulations provide that when evaluating medical
(continued...)

46

The ALJ attempted to dismiss Drs. Tolentino and Baltasar's assessments by stating that the other professionals found Mr. Christie capable of performing medium and light work. (R. 26). Even if true, why their testimony was preferable or superior to that of the treating physicians was never explained. Apart from the seemingly arbitrary nature of the selection of professional opinion, the ALJ misstated the purportedly contradictory evidence. First, the ALJ referred to a work capacity evaluation performed on May 11, 2000 that stated Mr. Christie is capable of performing medium work; however, the evaluators (i.e., an occupational therapist and physical therapist), who assessed Mr. Christie, noted that he could only perform medium work occasionally and had a distressing pain-level after the evaluation. (R. 26, 251). Occasional work, accompanied by distressing levels of pain, is inconsistent with the ability to sustain gainful activity. *See* SSR 83-10 ("'Occasionally' means occurring from very little up to one-third of the time.").

Moreover, while the Commissioner asserts that the therapists' opinions were bolstered by

---

[38](...continued)
opinions about a claimant's impairment or disability, more weight is given to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(4). Moreover, "[g]enerally , we give more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective findings alone or from reports of individual examinations . . ." 20 C.F.R. § 404.1527(d)(2). If, however, a medical opinion is not entitled to controlling weight, it is accorded deference and must be weighed using the factors set out in the regulations. The ALJ is required to give "good reasons in [the] notice of determination or decision for the weight [given to a] treating source's opinion." *Id.*; *See also* SSR 96-2p.

The following factors are used in determining the weight given to a treating physician's opinion when it is not given controlling weight: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability (the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight is given to that opinion); (4) consistency (the more consistent an opinion is with the record as a whole, the more weight it is given); (5) specialization (more weight is given to the opinion of a specialist about medical issues related to that source's specialty); and (6) other factors (those factors which tend to support or contradict an opinion). 20 C.F.R. § 404.1527(d)(2)(i)(ii); 404.1527(d)(3)-(6).

47

Dr. Tolentino, she misstates his findings. (Def.'s Mem. at 11). Rather, Dr. Tolentino reviewed the report by the therapists and noted that "[t]here were recommendations to either perform work hardening or return to work on a reduced or restricted duty basis." (R. 538). An ALJ may not "play doctor" and substitute his own opinion for that of a physician, or make judgments that are not substantiated by objective medical evidence. *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996).

Next, the Commissioner points out that the ALJ cited to Dr. Bernstein's opinion that, in November 2001, Mr. Christie was capable of performing light duty work. (Def.'s Mem. at 11, R. 26). It is unclear, however, from Dr. Bernstein's opinion what he meant by light duty work. *See* SSR 96-5p ("From time-to-time, medical sources may provide opinions that an individual is limited to 'sedentary work,' 'sedentary activity,' 'light work,' or similar statements that appear to use the terms set out in our regulations and Rulings to describe exertional levels of maximum sustained work capability. Adjudicators must not assume that a medical source using terms such as 'sedentary' and 'light' is aware of our definitions of these terms."). In addition, the ALJ's reliance on Dr. Bernstein's opinion is misplaced because it only takes into account Mr. Christie's severe lower back impairment(s) and does not take into account all of his other severe impairments.

The ALJ also ignored Mr. Christie's hand and arm impairments which were caused by his cervical limitations when assessing his RFC. For instance, on October 4, 1999, Dr. Tolentino found positive Tinel signs over the median nerves of Mr. Christie's hands with the right being worse than the left with probable right carpal tunnel syndrome. (R. 237). As a result, Dr. Tolentino determined that Mr. Christie could only reach and finger occasionally, and never push and pull. (R. 513-14). Mr. Christie's arm pain and problems were noted by Dr. Mansfield on December 28, 1999. (R. 208, 209). These findings, however, were not considered by the ALJ in her RFC finding.

48

The ALJ also rejected Dr. Baltasar's opinion that Mr. Christie would most likely be absent from a job more than four[39] times a month initially, because the basis of this opinion "was not clear in the record."[40] (R. 26). Because the ALJ has a duty to develop a full and fair record, *Rogers v. Barnhart*, 446 F.Supp.2d at 835, the ALJ should not have allowed the basis of Dr. Baltasar's opinion to remain unclear. She was thus wrong to summarily reject his assessment. *See e.g.*, *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991).

The Seventh Circuit's decision in *Barnett v. Barnhart*, 381 F.3d 664 (7th Cir. 2004) is instructive here:

> An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable. 20 C.F.R. § 404.1527(c)(3); *see also* S.S.R. 96-2p at 4 ("[I]n some instances, additional development required by a case-- for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings--may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record."); *Smith v. Apfel*, 231 F.3d 433, 437-38 (7th Cir. 2000)(finding that the ALJ's duty to develop the record included soliciting updated medical records when the ALJ did not afford the treating doctor's opinion controlling weight on that basis); *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)("If the ALJ thought he needed to know the basis of [medical] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them."). Further, although a medical opinion on an ultimate issue such as whether the claimant is disabled is not entitled to controlling weight, the ALJ must consider the opinion and should recontact the doctor for clarification if necessary. S.S.R. 96-5p at 2. *Id.* at 669; *see also* 20 C.F.R. § 404.1512(e)(1).[41]

---

[39] Dr. Baltasar opined that Mr. Christie would most likely be absent from work more than three times a month and not four times a month. (R. 563).

[40] The ALJ stated that this limitation was "never proposed by any of the other professionals who assessed [Mr. Christie's] work-related limitations"; however, this is not a valid reason because there is no evidence in the record that this limitation was ever raised with these professionals. (R. 26).

[41] 20 C.F.R. § 404.1512(e)(1) provides, in pertinent part:

(continued...)

It bears noting that clarification of Dr. Baltasar's assessment is critical because Mr. Yep testified that employers would only tolerate an absenteeism rate of one day per month or twelve days per year. (R. 1004-05). Accordingly, if Mr. Christie were absent from a job more than three times a month, he would be unable to sustain substantial gainful activity and there would be no jobs he could perform.

The ALJ's assessment of Mr. Christie's mental impairment was also inadequate because she ignored the testimony of Dr. Oberlander that an affective or personality disorder, which Mr. Christie has been diagnosed as having, could exacerbate his pain and other physical symptoms. (R. 1000). In light of Mr. Christie's many physical ailments, as well as the record evidence which establishes he suffered from severe pain, the ALJ should have addressed Dr. Oberlander's testimony on this point. *Gentle v. Barnhart*, 430 F.3d 865 (7th Cir. 2005)(Posner, J.).

In addition, the ALJ did not consider the combined effect of all of Mr. Christie's impairments. *See Mendez v. Barnhart*, 439 F3d 360, 366 (7th Cir.2006)(Posner, J.); 20 C.F.R. § 404.1523 ("In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to

---

[41](...continued)
We will first recontract your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1512(e)(1).

Moreover, if the relevant information cannot be obtained from Dr. Baltasar, the ALJ shall follow the mandate established in 20 C.F.R. § 404.1512(f) which states if " . . . we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense." 20 C.F.R. § 404.1512(f).

whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."); *Golembiewski v. Barnhart*, 322 F.3d at912, 918 (7th Cir. 2003)("Having found that one or more of [the claimant's] impairments was 'severe,' the ALJ needed to consider the *aggregate* effect of this entire constellation of ailments-including those impairments that in insolation are not severe.")(emphasis in original). *See also Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005).

The record shows that Mr. Christie has a multitude of severe medical problems, which include back, neck, leg, knee, arm, hand, and mental impairments, the existence of all of which were substantiated by a myriad of medical records and testimony. The ALJ failed to assess the aggregate effect of these impairments when determining whether he was disabled. On remand, the ALJ must assess Mr. Christie's disability application by considering the total effect of all of his medical problems.

In view of the foregoing, a remand on the case is necessary for the ALJ to address (and, if tenable, further develop) the issues discussed herein. *See e.g., Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).[42]

---

[42] On remand, the ALJ is instructed to propound new hypothetical question(s) which incorporate all of Mr. Christie's RFC limitations discussed in this section. (*See also* Pl.'s Mem. at 23). *See e.g., Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)(to the extent the ALJ relies on testimony from a vocational expert, the hypothetical question posed must incorporate all of the claimant's limitations supported by medical evidence in the record); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)("Hypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record.")(emphasis in original); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003)(case remanded because the hypothetical question posed to the VE did not adequately reflect the extent of the claimant's mental limitations).

## 2.
## The ALJ's Credibility Finding Is Not Sustainable

Mr. Christie takes issue with the ALJ's determination that "[s]ignificant credibility issues also revolve around the fact that, despite the claimant's assertion of disability, he had a gambling problem so pervasive that he was driving all over to various casinos." (26-27). See Pl.'s Mem. at 19-23, Pl.'s Reply at 11-13. The Commissioner, of course, has a different view. (*Def.'s Mem.* at 12-14).

A reviewing court must afford an ALJ's credibility finding "considerable deference" and can overturn it only if "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).A credibility assessment is afforded special deference because an ALJ is in the best position to see and hear the witness and determine credibility. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). "Only if the trier of fact grounds [her] credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). When faced with evidence that both supports and detracts from a claimant's claims the resolution of competing arguments based on the record is for the ALJ, not the court. *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002).

But deference is not obeisance. In order for the court to affirm an ALJ's denial of benefits, the ALJ must have articulated the reasons for his decision and clearly expressed the reasoning process that led from the evidence to the ultimate conclusion. *Cf.* 42 U.S.C. § 405(b); 20 C.F.R. 404.1527(d)(2), 416.927(d)(2). Requiring administrative law judges to explain their conclusions is a recognition that they not exempt from the requirement that applies to courts at all levels of the federal system, namely that judicial decisions should not be based on some ineffable intuition or

unarticulated hunch. *See* discussion in *Rogers v. Barnhart*, 446 F.Supp.2d at 833.

SSR 96-7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p; *Prochaska*, 454 F.3d at 738. And, it requires an ALJ to consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). SSR 96-7p; *Prochaska*, 454 F.3d at 738; *Scheck*, 357 F.3d at 703.

In her decision, the ALJ stated that "[t]he claimant's complaints of disabling symptoms and limitations are not entirely credible . . . . " (R. 28). Precisely which parts were credible and which were not is left to conjecture. What is certain is that the complaints of disabling symptoms and limitations *were* in part, credible, and thus could not be uncritically dismissed.

Moreover, the ALJ's adverse credibility determination cannot be sustained because it is based on a truncated view of the evidence. As explained in Section IV.C.1, *supra*, the ALJ failed to address substantial objective medical evidence when assessing Mr. Christie's RFC – evidence which was integral to a credibility determination. A simple paradigm makes the point: factors 1 through 10 bear upon a claimant's allegations of disability. Four of the factors are ignored by the judge. The remaining factors are then used as the basis to determine that testimony was not credible. Had those four factors been considered, they would have altered the meaning of the six factors on which the judge relied. Obviously, it is a *non-sequitur* to conclude under these circumstances that a credibility determination adverse to the claimant can pass muster.

There is a further problem with the administrative law judge's credibility determination based

53

upon a contradiction between Mr. Christie's daily activities and his claims of pain and incapacity. The ALJ failed to consider the difference between a person's being able to engage in sporadic, physical, daily activities and being able to work eight hours a day, five consecutive days of the week. *See Gentle v. Barnhart*, 430 F.3d at 867 " *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005); *Clifford v. Apfel, supra*, 227 F.3d at 872; *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir.2001); *Easter v. Bowen, supra*, 867 F.2d at 1130. Mr. Christie did not claim to be in agonizing pain every minute of the day or totally incapacitated. Quite the contrary. His claims were balanced and consistent with his claimed ailments, the existence of which were supported by the medical evidence, and the expert opinions that his psychological condition could play an exacerbating role in connection with pain. *See Carradine v. Barnhart*, 360 F.3d 751, 755-756 (7th Cir. 2004)(Posner, J.).

One aspect of Mr. Christie's activities that was especially troubling to the ALJ – and on which she based her negative credibility assessment – was the fact that Mr. Christie "had a gambling problem so pervasive [according to her] that he was driving all over to various casinos." (R. 26-27) 244, 416, 425, 588). This conclusion was based on the testimony of Dr. Oberlander's testimony, which in turn was based on Dr. Gelman's report. (R. 415-17, 999, pg. 21-22, 33 of opinion). Dr. Gelman's report contains the following statement:

> Mr. Christie describes a typical day as follows: "I go nuts day in and day out . . . I spend a lot of time going to casinos . . . I try to make payments over and above (what my bills require) . . . I tried to go to Gambler's Anonymous . . . avoided it . . . since I've been down, I get depressed . . . stress . . . anxiety takes over . . . I fear going back to work . . . I seem to be accident prone . . . I have problems with my back . . . if I lift over (a certain amount), I can get in trouble . . . either I find excuses to try something or I build a wall around me." (R. 415).

That Mr. Christie went to casinos with frequency does not undercut his claims of incapacity

or pain and is perfectly consistent with his long history of psychopathology.[43] Moreover, the ALJ's adverse credibility determination based on this factor ignored Mr. Christie's testimony that he would be able to change positions frequently while driving and, that when he drove he would make frequent stops. (R. 26-27, 986-87, 991-92, 995-96).[44] Mr. Christie's travels to casinos thus had, as Judge Posner observed in a related context, "a degree of flexibility that work in the workplace does not." *Gentle v. Barnhart*, 430 F.3d at 867. And I can take judicial notice of the fact that lifting cards or chips or dice is not inconsistent with the inability to lift more than 10 lbs. or claims of pain and loss of mobility.

Where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," an ALJ's credibility determination will not be upheld. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). That is the case with the ALJ's conclusion that "[s]ignificant credibility issues" were raised by Mr. Christie's visits to casinos.[45]

## CONCLUSION

In view of the foregoing, the plaintiff's motion for summary judgment is GRANTED insofar

---

[43] The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition. Washington, DC, American Psychiatric Association, lists pathological gambling as an Impulse Control Disorder.

[44] Of course, Mr. Christie's overall credibility could legitimately have been called into question had he tried to conceal his gambling activities or told inconsistent versions about them, for vacillating versions of events are a persuasive datum in making credibility determinations. *See, e.g., Ryder Truck Rental v. NLRB*, 401 F.3d 815, 827 (7th Cir.2005); *Bailey v. United States*, 1997 WL 759654 at *35 (Fed.Cl.1997); *United States v. Nixon*, 881 F.2d 1305, 1309 (5th Cir.1989)..

[45] The ALJ was also concerned that Mr. Christie's claims of difficulty in concentrating were not credible in light of his visits to the casinos. In this regard Dr. Oberlander opined that ". . . it's hard to tell where limitations fit in when you have Claimant describing activities such as that of being able to stay focused enough and drive to casinos, pay attention in casinos to what he's doing." (R. 999). But what was he doing and how successful and focused was he. Those are the questions not answered by Dr. Oberlander's musings.

as it requests a remand, and the Commissioner's motion for summary judgment is DENIED. Accordingly, the cause is remanded, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with this opinion.[46]

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

DATE: 1/16/07

---

[46] Because of the bases for the remand set forth in Section IV.C.1 of this opinion, it is not necessary at this time to address Mr. Christie's last argument that the ALJ wrongly found Mr. Christie capable of performing work as a sorter and assembler based upon the erroneous testimony of Mr. Yep. (*See Pl.'s Mem.* at 23-25, Pl.'s Reply at 13-14, Pl.'s Notice of Citation of Supplemental Authority at 1-2).